**STATE OF LOUISIANA**      \*      **NO. 2023-KA-0040**

**VERSUS**      \*

     **COURT OF APPEAL**

**JOSHUA C. RILEY**      \*

     **FOURTH CIRCUIT**

     \*

     **STATE OF LOUISIANA**

**\* \* \* \* \* \* \***

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 551-880, SECTION "D"
Judge Kimya M. Holmes
\* \* \* \* \* \*
**Judge Paula A. Brown**
\* \* \* \* \* \*

(Court composed of Judge Rosemary Ledet, Judge Paula A. Brown, Judge Dale N. Atkins)

Brad Scott
Jason Rogers Williams
Thomas Frederick
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA 70119--5045

     COUNSEL FOR THE STATE OF LOUISIANA

Jacob K. Weixler
WEIXLER LAW LLC
PO Box 52197
New Orleans, LA 70152-2197

     COUNSEL FOR DEFENDANT/APPELLANT

                              **AUGUST 31, 2023**
                                      **AFFIRMED**

**RML**
**PAB**
**DMA**

In this criminal appeal, Defendant, Joshua C. Riley ("Defendant"), seeks review of the May 18, 2022 jury's verdict, which found him guilty of one count of third degree rape, a violation of La. R.S. 14:43.[1] Defendant argues that the district court committed reversible error by allowing: (1) the victim A.W.[2] to testify to lay opinion evidence; and (2) the State of Louisiana (the "State") to pose hypothetical questions to its toxicology expert. Defendant also appeals the district court's denial of his motion for new trial based on a *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) violation—where Defendant showed A.W. falsified testimony—and ineffective assistance of counsel. After review of the record and for the reasons set forth below, we find the district court did not commit reversible error in its evidentiary rulings nor did it err in denying Defendant's motion for new

---

[1] Louisiana Revised Statute 14:43 provides, in pertinent part:

  A. Third degree rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:

  (1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity.

[2] Because of the nature of the crime, this opinion will refer to the victim by her initials. *See* La. R.S. 46:1844(W).

1

trial. Accordingly, we affirm the jury's verdict and the district court's judgment denying the motion for new trial.

## FACTS AND PROCEDURAL HISTORY

Many of the facts of this case are not in dispute. On July 7, 2019, victim A.W. posted on the social networking app Snapchat that after dinner she was going to work at Scores Gentleman's Club ("Scores") on Bourbon Street. Defendant, whom A.W. was friends with on Snapchat, walked into the club during her shift, and the two had a short conversation. After A.W.'s shift, the two of them walked to a nearby bar, The Three Legged Dog (the "Bar"). Defendant and A.W. arrived at the Bar around 3:00 a.m. and had drinks together over the span of three hours. They each took several shots, and, at one point, A.W. left the Bar to buy cocaine. After A.W. returned to the Bar, the two continued to drink. A.W. became progressively more intoxicated as the night went on. According to video footage from the Bar, at approximately 6:20 a.m., A.W.—who appeared to lose consciousness—fell down to the floor inside of the Bar. The video further showed that at approximately 6:40 a.m., after A.W. fell to the floor a second time— Defendant picked her up and carried her out of the Bar towards his car. As Defendant was carrying A.W., the two fell to the ground, then sat against a brick wall and smoked marijuana while Defendant caught his breath. A.W. also ingested cocaine at this time.

Afterward, A.W. fell asleep in Defendant's car. When she awoke that afternoon, she was not wearing pants or underwear. She and Defendant's car seat were covered with blood. She then asked Defendant to drive her to a drug store. Defendant drove her to the CVS Pharmacy ("CVS") located on Elysian Fields Avenue near the intersection of North Claiborne, where she called 911 at

2

approximately 1:45 p.m. In the 911 call, A.W. reported that she had blacked out but believed she had been raped. She felt as though she was going to pass out again. She said she was at a CVS, although she was not sure of the store's specific location, and asked for someone to take her to a hospital. About fifteen minutes later, the police found A.W. walking along North Claiborne and took her to University Medical Center ("UMC"). At UMC, A.W. underwent a forensic medical exam at approximately 4:00 p.m.

After the forensic medical exam, A.W. gave a recorded statement to Detective Brandon McDonald ("Det. McDonald") of the New Orleans Police Department ("NOPD") Sex Crimes Unit, and identified Defendant as her assailant. Det. McDonald collected the sexual assault examination report and submitted it to the Louisiana State Police Crime Lab ("LSP Crime Lab") for testing. He also collected surveillance video from the Bar. The LSP Crime Lab released the results of A.W.'s forensic medical examination on October 24, 2019. A.W.'s blood alcohol concentration was 0.15 percent, and she tested positive for cocaine and cannabinoids. Based on those results and A.W.'s belief that she had been raped, Det. McDonald applied for a search warrant to obtain a DNA swab from Defendant on October 29, 2019. Thereafter, on November 19, 2019, Det. McDonald obtained an arrest warrant for Defendant. On March 29, 2021, the LSP Crime Lab released a supplemental report, which confirmed that the DNA collected from A.W.'s vaginal swabs tested positive for Defendant's seminal fluid. The State filed a bill of information on April 14, 2021, charging Defendant with one count of third degree rape. On May 16, 2022, the case proceeded to a two-day jury trial. The pertinent testimony elicited at trial is as follows:

*A.W.'s Sister*

3

A.W.'s Sister testified that on July 7, 2019, she received a call from A.W., who was crying and screaming that she had been drugged and raped. A.W.'s Sister testified that A.W. told her she woke up in a car, without pants on, and that she was bloody.

*Heidi Martin*

Heidi Martin ("Ms. Martin"), a forensic nurse at UMC, was qualified as an expert in sexual assault and forensic examinations. She did not perform the forensic medical exam on A.W., but she reviewed and testified to the contents of the documents related to A.W.'s exam. Ms. Martin said the forensic examiner described A.W.'s appearance as disheveled, glaze-eyed, tired, anxious and tearful. The forensic medical examiner swabbed A.W.'s genitals and vaginal pool, and A.W. submitted blood and urine samples. Ms. Martin explained that A.W. removed a tampon before the examination, but during the examination, the forensic examiner found another tampon lodged in A.W.'s vaginal vault.

During the exam, A.W. confirmed that she had consumed alcohol within twelve hours of the assault, and cocaine within ninety-six hours of the assault. A.W. also had experienced a loss of consciousness and a loss of memory, but she identified her assailant as Defendant, an acquaintance on social media. A.W. told the forensic examiner that she woke up in a car with her pants in the backseat and that there was blood everywhere. She did not remember getting into the car or leaving the Bar. She said that she and Defendant walked to the Bar and she had four to five drinks, but not enough to be in the state she was in.

*A.W.*

A.W. testified that on July 7, 2019, she posted on social media that she was going to dinner before starting her shift at work at Scores. She testified that

4

Defendant, whom she did not recognize at first, walked into the club during her shift, and the two had a short conversation. The club's DJ told Defendant to leave because the club was nearing closing time, but Defendant answered that he wanted to finish talking to A.W. After her shift, she changed and walked to the Bar to meet a friend. She explained that Defendant followed her and kept asking to take her home, but she declined. A.W. recalled that while at the Bar, Defendant was very persistent so she sat with him and had drinks. She purchased cocaine from a friend, and Defendant bought her drinks. She remembered getting very drunk. She did not remember leaving the Bar with Defendant. Later that morning, she awoke in Defendant's car not wearing pants or underwear, blood was everywhere, and she felt pain in her private area, which she described as having had rough sex. She felt as if she had been raped. She asked Defendant where she was, and he replied, "[o]h, you were drunk. I was taking care of you . . . ." A.W. asked Defendant to drive her to a drug store, and he drove her to a CVS. Once inside the CVS, A.W. called the police. A.W. said that she started walking away from CVS because she was scared. A.W. testified that "[she] felt like [there] was still something wrong with [her]" and that "[i]t was not a hangover feeling . . . . [she's] been hungover before."

A.W. recounted that she met Defendant about three years earlier on her eighteenth birthday at a dance club on Bourbon Street, where they exchanged their social media contact information. The next time she saw Defendant was on the night of the incident. A.W. said that she did not interact with Defendant on social media that night; the first time they interacted that day was when Defendant came into Scores.

A.W. did not remember ingesting cocaine, but knew she had done so because her lab results showed cocaine in her system. While there were no other drugs present in A.W.'s toxicology report besides marijuana and cocaine, she believed that she had been drugged. A.W. explained that to her understanding, date rape drugs can get out of your system quickly. On cross-examination, A.W. confirmed that she had no science degrees and no degree in toxicology and that she gained her knowledge of date rape drugs from television.

*Detective Brandon McDonald*

Det. McDonald served as the primary detective on the case. He testified that he was notified that a female reported that she had been raped and was dropped off at an unknown location. Det. McDonald instructed the unit to have the victim undergo a sexual assault examination at UMC. When he arrived at the hospital, he could tell A.W. had been drinking because her speech was slurred and she did not remember what happened. Det. McDonald testified that a driver's legal limit for blood alcohol concentration is 0.08 percent and that A.W.'s blood alcohol concentration test results confirmed his suspicions that she was still intoxicated at the hospital.

*Justin Manuel*

Justin Manuel ("Mr. Manuel"), a forensic DNA analyst at the LSP Crime Lab, testified as an expert in the field of forensic DNA analysis. Mr. Manuel prepared the DNA report in this case and testified that DNA tests conducted on evidence from A.W.'s rape kit were positive for seminal fluid. Mr. Manuel confirmed that Defendant's DNA profile was the same as the DNA profile found on A.W.'s vaginal swabs.

*Hailey Harris*

Hailey Harris ("Ms. Harris"), a crime lab analyst at the LSP Crime Lab, testified as an expert in blood alcohol analysis. Ms. Harris testified that the lab received a blood alcohol kit, which contained blood and urine from A.W. She confirmed that A.W.'s blood alcohol concentration was 0.15 percent.

*Mary Kate Parker*

Mary Kate Parker ("Ms. Parker") testified that she is a crime lab analyst and performs toxicological analysis on blood and urine samples submitted to the LSP Crime Lab. Ms. Parker prepared a toxicology report in A.W.'s case, which reflected that A.W. tested positive for cocaine and cannabinoids. Ms. Parker only tested for the presence or absence of controlled substances other than alcohol. Ms. Parker testified that if an individual had a blood alcohol level of 0.15 percent at the time of testing, their blood alcohol level would have been about 0.3 percent ten hours prior.

*Joshua Riley*

Defendant testified on his own behalf. He said that he met A.W. a few years earlier on the dancefloor at a night club on Bourbon Street. During that meeting, they kissed at the nightclub and exchanged contact information. Since then, they stayed in touch on and off with short social media interactions. Defendant testified that he corresponded with A.W. on social media before meeting with her on July 7, 2019. He asked her what she was doing and she replied that she had to work at Scores. Defendant asked if he could visit her and she told him that he could. He arrived at Scores around 2:00 a.m. the following morning. He was there for thirty to forty-five minutes before the DJ told him to leave. A.W. told the DJ that it was okay for Defendant to be there because he was with her. A.W. then told Defendant

that she had to change, and asked him to wait for her outside. She came out five minutes later, and the two walked to the Bar together.

They arrived at the Bar at approximately 3:30 a.m. and sat at the bar and talked. Both Defendant and A.W. had multiple drinks. A.W. left for approximately ten minutes to purchase cocaine and marijuana. Defendant testified that he carried A.W. out of the Bar and after walking a block or two from the Bar, the two fell. Afterwards, they sat against a brick wall for twenty to thirty minutes. While sitting against the brick wall, they talked and smoked marijuana together, and A.W. snorted cocaine.

By the time they arrived at Defendant's car, it was daylight. A.W. got in the passenger seat and Defendant got in the driver's seat, where the two talked and kissed. With Defendant's assistance, A.W. pulled Defendant's penis out of his pants and performed oral sex on him until Defendant ejaculated on A.W.'s hands and face. She then took her pants off, climbed in the back seat, and asked him to have intercourse with her. Defendant said that he declined, and A.W. then climbed into the driver's seat. Defendant recounted that A.W. placed her hands, which she had previously used to retrieve Defendant's penis, on her own vagina. She continuously asked Defendant to have sexual intercourse with her until she fell asleep. He nudged her, and she climbed back to the passenger seat. Defendant then drove to a gas station and purchased cigarettes. When he returned to the car, A.W. was still sleeping. They slept in the car until Defendant woke up about 9:00 a.m. Defendant said he bought some lunch and then dropped A.W. off at a CVS, where A.W. said she would have someone pick her up.

Defendant testified that: (1) he did nothing without A.W.'s consent; (2) that the sexual interactions that occurred between them were initiated by A.W.; and (3)

the sexual interactions ceased when he withdrew his consent. He denied having sexual intercourse with A.W. He further testified that he was comfortable with oral sex, but not vaginal sex because A.W. was on her menstrual cycle.

During the State's cross-examination, the State introduced a photograph of a cellphone that showed Snapchat messages from "JRILEY" to "ME." Defendant testified that the phone depicted in the photograph was not his; however, the messages showed his Snapchat username and some messages to A.W. from his account. A chain of messages from July 7, 2019, read:

| | |
|---|---|
| **ME:** | [You are] really f[]d up[.] |
| **JRILEY:** | I never did nothing but help you but yea ok I'm f[]d up[.] |
| **ME:** | Did we have sex[?] |
| **JRILEY:** | No[.] |
| **ME:** | Ok[.] |
| **JRILEY:** | We [were] f[]d up last [night][.] |
| **ME:** | I think I was [m]ore f[]d up th[a]n [you][.] |
| **JRILEY:** | [I know] I carried your ass[.] |
| | I'm sorry if you feel disrespected but [I] didn't[.] |

Following the trial, on May 18, 2022, the jury returned a verdict finding Defendant guilty as charged. On September 23, 2022, Defendant, represented by a new attorney, filed a motion for new trial. The district court denied Defendant's motion on October 7, 2022, and sentenced him to twelve years at hard labor without benefit of parole, probation or suspension. This timely appeal followed.

## ERRORS PATENT

Appellate courts review all criminal appeal records for the existence of a patent error. *See* La. C.Cr.P. art. 920(2).[3] A review of the record revealed one error

---

[3] Louisiana Code of Criminal Procedure art. 920(2) provides that the scope of appellate review includes: "An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

patent: the district court failed to observe the twenty-four hour delay before sentencing the defendant after denying his motion for a new trial.

Louisiana Code of Criminal Procedure art. 873 provides that "[i]f a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." "If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately." *Id.* As such, if a defendant expressly waives the twenty-four hour sentencing delay, the district court's failure to observe the delay after a motion for new trial is harmless error. *State v. Robinson*, 21-0254, p. 21 (La. App. 4 Cir. 2/18/22), 336 So.3d 567, 580 (citations omitted), *writ denied*, 22-00437 (La. 5/24/22), 338 So.3d 1185, *application for reconsideration not considered*, 22-00437 (La. 9/7/22), 345 So.3d 430.

The Louisiana Supreme Court has held that a defendant's pronouncement of his readiness for sentencing may operate as an express waiver of the twenty-four hour sentencing delay, but a defendant's mere participation in the sentencing hearing is insufficient to constitute an express waiver required by La. C.Cr.P. art. 873. *State v. Kisack*, 16-0797, p. 7 (La. 10/18/17), 236 So.3d 1201, 1205. The Court has further observed that, nevertheless, "an error in failing to observe the statutory sentencing delay may still be found harmless." *Kisack*, 16-0797, p. 7, 236 So.3d at 1205-06.

In the case *sub judice*, Defendant was convicted by a jury on May 18, 2022. On September 23, 2022, Defendant filed a motion for new trial, which the district court denied at a hearing held on October 7, 2022. Immediately following the denial of the motion for new trial, the district court began Defendant's sentencing hearing. The State presented a victim impact statement from A.W., and Defendant

presented testimony from his girlfriend. Defendant also filed into evidence three affidavits and his medical records. After testimony, Defendant presented a lengthy argument, at the conclusion of which he asked for probation and no jail time, and he submitted a sentencing memorandum. The State requested a twenty-year sentence. The district court sentenced Defendant to twelve years, less than half the maximum sentence of twenty-five years. *See* La. R.S. 14:43(B).

Defendant neither expressly stated that he waived sentencing delays, nor did he expressly announce his readiness for sentencing. However, he did not object to immediate sentencing, and he was seemingly prepared for sentencing, as reflected by the presence in court of a witness who testified on his behalf and his introduction of prepared affidavits and a sentencing memorandum. Moreover, he did not raise the district court's failure to observe the delay as an error, did not file a motion to reconsider his sentence, and did not raise a sentencing issue on appeal.

Accordingly, although the district court erred in failing to observe the twenty-four hour delay required by La. C.Cr.P. art. 873, we conclude the error was harmless.

## DISCUSSION

Defendant raises five assignments of error:

1. The trial court erred by failing to rule on the merits of Mr. Riley's motion for new trial under La. Code Crim. Proc. art. 851.

2. The trial court erred by denying Mr. Riley's motion for new trial under *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed. 2d 1217 (1959) where Mr. Riley showed that A.W. falsely testified regarding significant portions of her allegations.

3. The trial court erred by denying Mr. Riley's motion for new trial under La. Code Crim. Proc. art. 851 because trial counsel's failure to impeach or effectively cross-examine the alleged victim, A.W., was objectively unreasonable and prejudicial to Mr. Riley.

11

4. The trial court erred by permitting A.W. to speculate and offer her lay opinion testimony that she had been drugged on the night of her alleged assault, and that the drugs were not detected by toxicology testing because those drugs are "not going to stay in your system long."

5. The trial court erred by permitting the state to ask hypothetical questions with no basis in the evidentiary record of an expert witness to establish A.W.'s level of intoxication at the time of her sexual encounter with Mr. Riley.

The first three alleged errors relate to the district court's denial of Defendant's motion for new trial, while the latter two relate to alleged errors committed by the district court during the jury trial of this matter. In order to maintain continuity of the opinion, we will first address Defendant's assignments of error numbers four and five, respectively, followed by a discussion of assignments of error numbers one, two and three, collectively. Although not specifically assigned as an error and before addressing the merits of the errors assigned, we review the sufficiency of the evidence.

*Sufficiency of the Evidence*

Appellate courts review the sufficiency of evidence used to support a conviction under the *Jackson* standard. *See Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979). Under *Jackson* "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. "The principal criteria of a *Jackson* . . . review is rationality." *State v. Dukes*, 19-0172, p. 7 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 752 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988)). As such, "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to

guarantee the fundamental protection of due process of law." *State v. Alexis*, 14-0327, p. 6 (La. App. 4 Cir. 12/3/14), 157 So.3d 775, 778 (quoting *Mussall*, 523 So.2d at 1310 (La. 1988)).

Defendant was convicted of third degree rape, pursuant to La. R.S. 14:43. To support a conviction of third degree rape under La. R.S. 14:43(A)(1), the prosecution must prove that the oral sexual intercourse occurred without the lawful consent of the victim because "the victim [was] incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity." *Id.* The evidence adduced at trial showed: (1) Defendant and A.W. engaged in oral sexual intercourse; (2) A.W. tested positive for marijuana and cocaine and had a blood alcohol level of 0.15 percent—almost twice the legal limit—approximately ten hours after consuming her last alcoholic beverage; and (3) Defendant knew or should have known that A.W. was under the influence of an intoxicating agent when he carried her out of the Bar after she had twice fallen off a bar stool onto the floor. We find that based on the evidence, a rational jury could have found Defendant guilty of third degree rape beyond a reasonable doubt.

Now we turn to the merits of Defendant's assigned errors.

### *Assignment of Error Number 4 – The district court erred in permitting lay opinion testimony*

Defendant argues in his fourth assignment of error that the district court abused its discretion by permitting A.W. to speculate, over Defendant's objection, that she was drugged despite the results of her toxicology report showing that there were no date rape drugs in her system. Defendant insists that as a lay witness A.W.

13

has no scientific training or education to make such a statement. Thus, the admittance of such testimony amounted to reversible error by the district court.

"As a general rule, a lay witness may draw reasonable inferences from his or her personal observations." *State v. D.D.*, 18-0891, p. 67 (La. App. 4 Cir. 12/27/19), 288 So.3d 808, 855. "If the testimony constitutes a natural inference from what was observed, no prohibition against it as the opinion of a non-expert exists, as long as the lay witness states the observed facts as well." *Id.* (citing *State v. LeBlanc*, 05-0885, p. 7 (La. App. 1 Cir. 2/10/06), 928 So.2d 599, 603). "The [district] court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony." *State v. Handy*, 16-1071, p. 23 (La. App. 4 Cir. 9/13/17), 226 So.3d 1182, 1198 (citing *State v. Friday*, 10-2309, p. 9 (La. App. 1 Cir. 6/17/11), 73 So.3d 913, 922), *writ granted*, *cause remanded*, 17-1823 (La. 12/15/17), 231 So.3d 609. "On appeal, a reviewing court must ask two pertinent questions to determine whether the district court properly allowed lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error." *D.D.*, 18-0891, p. 67, 288 So.3d at 855 (citing *Leblanc*, 05-0885, pp. 7-8, 928 So.2d at 603).

A.W., an admitted partier, testified at trial that she awoke in Defendant's car with no pants on—her pants were in the back seat—the seat was laid back, and she was sore in her private area. She said that she was confused when she awoke because she did not remember leaving the Bar with Defendant. On cross-examination, A.W. admitted that her urine and blood test were positive for alcohol, cocaine and marijuana. When questioned further by defense counsel, she denied

that she tested positive for any other drugs, but stated that she "[did] feel like [she] was drugged" and that "those drugs, they can get out of your system within a certain amount of time."  Counsel for Defendant then objected to A.W.'s testimony, which the district court overruled, finding that based on his line of questioning, the defense "opened the door."  Under further cross-examination, A.W. testified that she obtained her knowledge about being drugged from her own personal instinct, from being a partier and from television shows such as *Forensic Files*.  We find the nature of A.W.'s testimony—that based on how she felt, she believed that she had been drugged—can reasonably be inferred from her experience as a frequent substance user, and not merely from speculative opinion evidence.

In addition, even if the district court committed error in allowing the opinion testimony, A.W.'s testimony was not so prejudicial to the defense as to constitute reversible error.  Review of the record shows that after defense counsel's objection was overruled, he continued to cross-examine A.W. and made certain that the jury understood that A.W. had no formal education in toxicology and that the basis of A.W.'s knowledge was from television. Moreover, the jury was clearly aware that the toxicology results did not show the presence of a date rape drug.

Consequently, we conclude the district court did not commit reversible error in allowing A.W. to testify that she believed she was drugged.  This assignment of error is unpersuasive.

### Assignment of Error Number 5 – The district court erred in permitting hypothetical testimony by an expert

In his fifth assignment of error, Defendant argues that the district court erred by permitting the State to pose hypothetical questions to Ms. Parker, the State's

15

toxicology expert, which required her to work backwards to determine how much alcohol someone had in their system at a prior time.

Louisiana Code of Evidence Article 702(A) provides that:

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . (2) [t]he testimony is based on sufficient facts or data; (3) [t]he testimony is the product of reliable principles and methods; and (4) [t]he expert has reliably applied the principles and methods to the facts of the case.

"An expert may base his opinion on facts or data not admissible or admitted into evidence if those facts are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Zimko v. Am. Cyanamid*, 03-0658, p. 37 (La. App. 4 Cir. 6/8/05), 905 So.2d 465, 490-91 (quoting Frank L. Maraist, *Opinion Testimony—Eliciting the Expert's Testimony* in 19 *Louisiana Civil Law Treatise: Evidence and Proof*, § 11.4 n.5 (1999)). The facts or data underlying the expert witness's opinion may be based on "facts or data presented to him at trial, thus approving the use of hypothetical questions." La. C.E. art. 703 (cmt. d). The "[a]dmission of erroneous evidence is subject to harmless error analysis and 'the test for determining harmless error is []whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" *State v. Duckett*, 19-0319, p. 9 (La. App. 4 Cir. 12/18/19), 288 So.3d 167, 174 (quoting *State v. Hugle*, 11-1121, p. 19 (La. App. 4 Cir. 11/7/12) 104 So.3d 598, 613).[4] "[T]rial error occurs during the presentation of the case to the [jury] and may be quantitatively assessed in context of the other evidence to determine whether its admission at trial is harmless beyond a reasonable doubt." *Id.*

---

[4] *See Duckett*, 19-0319, p. 9, 288 So.3d at 174, where this Court observed that the admission of potentially impermissible testimony was harmless error because the evidence of the defendant's guilt was overwhelming.

16

(alteration in original) (quoting *State v. Johnson*, 94-1379, p. 14 (La. 11/27/95), 664 So.2d 94, 100-01).

Defendant contends that the State was allowed to impermissibly use "unsubstantiated hypothetical questions" to prove that A.W. was in a stupor or abnormal condition of mind produced by an intoxicating agent as required under La. R.S. 14:43(A)(1) to prove third degree rape. In support of his argument, Defendant cites *State v. Rovira*, 483 So.2d 1093, 1096 (La. App. 4 Cir. 1986) for the proposition that where the record does not support the facts assumed by an expert in a hypothetical question, the hypothetical question is impermissible. Defendant, relying on *Meany v. Meany*, urges that because the district court permitted an impermissible question to be posed, this Court should reverse where the other evidence in the record does not fairly prove the matter addressed by the improper hypothetical. *Meany*, 94-0251, p. 10 (La. 7/5/94), 639 So.2d 229, 236.

At trial, Ms. Parker—who was qualified as an expert in toxicological analysis, including blood alcohol and urine analysis—testified that a person usually metabolizes alcohol at an average of 0.015 percent per hour; however, the rate could vary based on the person's height, weight and sex, or what a person had eaten. Ms. Parker explained that if one knew the time a subject stopped drinking alcohol, one could use the metabolism rate to estimate the subject's earlier blood alcohol level. The State then presented a hypothetical to Ms. Parker and asked her if she could determine someone's blood alcohol level ten hours prior to a blood alcohol content test. Over defense counsel's objection, the district court allowed Ms. Parker to testify to the hypothetical. Ms. Parker stated that, hypothetically, if an individual had a blood alcohol level of 0.15 percent and ten hours have passed since the person's last drink, their blood alcohol level would have been about 0.3

17

percent. On cross-examination, Ms. Parker testified that she had never worked backwards to determine how much alcohol someone had in their system at a prior time.

Our review of the record shows that the hypothetical presented to Ms. Parker assumed facts that the evidence sufficiently supported. As previously discussed, the video surveillance from the Bar reflects that A.W. and Defendant finished drinking at approximately 6:00 a.m. At approximately 6:20 a.m. A.W., with her head and eyes rolling backwards, fell off the stool onto the floor, and almost twenty minutes later she fell a second time. Shortly after the second fall, Defendant carried A.W. out of the Bar. The evidence established that Defendant drove to CVS, and A.W. called 911 at approximately 1:45 p.m. The evidence further established that the first NOPD officer arrived on the scene approximately fifteen minutes later and took her to UMC, where she underwent a forensic medical exam around 4:00 p.m. She appeared disheveled and glaze-eyed, her speech was slurred, and her blood alcohol level was 0.15 percent. Additionally, Defendant confirmed that he and A.W. had multiple drinks at the Bar to the point where he had to carry A.W. out of the Bar. Defendant further testified that he and A.W. sat on a brick wall for twenty to thirty minutes, smoked marijuana together, and A.W. ingested cocaine. There was no testimony elicited from Defendant, A.W. or any other witness that A.W. continued to drink alcohol after leaving the Bar.

Based on our review, we find the record evidence is sufficient to support the facts assumed by an expert in the hypothetical question—that there was a ten-hour window between A.W.'s last drink and the time she submitted to a forensic exam.

This assignment of error lacks merit.

***Assignments of Error Number 1, 2, and 3 – The district court erred in failing to rule on the motion for new trial, and Defendant is entitled to a new trial based on false testimony and ineffective assistance of counsel***

In his first assignment of error, Defendant argues that the district court abused its discretion in failing to consider the merits of his well-pleaded motion for new trial brought under La. C.Cr.P. art. 851(B)(5), wherein he argued that A.W. repeatedly testified untruthfully in violation of *Napue*[5] and Defendant's trial counsel was ineffective.[6]  Defendant contends the district court denied his motion for new trial without addressing his *Napue* claims and erroneously relegated his ineffective assistance of counsel claims to post-conviction relief when it stated:

> Because I think there are other avenues in which you can plea ineffective assistance of counsel and I believe the Motion for New Trial is the improper avenue for that.  I believe that would be more of a [post-conviction relief] application.

We disagree.

Louisiana Code of Criminal Procedure art. 851 provides in pertinent part:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
>
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
> * * *
>
> (4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment.

---

[5] *Napue* will be discussed more fully *infra*.

[6] Defendant's motion for new trial filed in the district court was also brought under La. C.Cr.P. art. 851(B)(4), which will be more fully discussed *infra*.

(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

"Neither the appellate nor supervisory jurisdiction of the supreme court may be invoked to review the granting or the refusal to grant a new trial, except for error of law." La. C.Cr.P. art. 858. "[T]he trial judge has much discretion in ruling on a motion for a new trial and, upon review, an appellate court may only set aside the judgment upon a finding that the trial judge exercised his discretion in an arbitrary manner." *State v. Williams*, 17-0544, p. 29 (La. App. 4 Cir. 3/14/18), 240 So.3d 355, 371 (quoting *State v. Chambers*, 16-0712, p. 12 (La. App. 4 Cir. 2/15/17), 212 So.3d 643, 650). Thus, legal determinations such as the denial of a motion for new trial, are reviewed under an abuse of discretion standard. *State v. Guillory*, 10-1231, p. 4 (La. 10/8/10), 45 So.3d 612, 615. "A defendant bears the burden of proof when seeking a new trial as a result of his conviction, previously obtained by the prosecution." *State v. Armstead*, 14-0036, p. 25 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 519. "When the allegations of a motion for new trial are not supported by proof, a [district] judge properly overrules the motion." *State v. McKinnies*, 13-1412, p. 11 (La. 10/15/14), 171 So.3d 861, 870 (citing *State v. Bueche*, 243 La. 160, 186, 142 So.2d 381, 390 (La. 1962); *State v. Slack*, 227 La. 598, 602, 80 So.2d 89, 90 (La. 1955); *State v. Roberson*, 159 La. 562, 568, 105 So. 621, 623 (La. 1925)). "Allegations raised in the motion alone are not sufficient, as a defendant has the burden to show that an injustice has been done to him." *Id.* (citing La. C.Cr.P. art. 851).

In the case *sub judice*, Defendant brought a motion for new trial under both La. C.Cr.P. art 851(B)(4) and (B)(5). In support of his Article 851(B)(4) *Napue* claim, Defendant offered into evidence the audio recording of the statement by

20

A.W.—which was produced by the State in discovery and could have been used to impeach A.W. at trial—to show that A.W.'s testimony was false. After hearing argument of counsel, the district court denied the claim and stated:

> Again, the grounds for a new trial, there are five. . . . The Defense had discovered since the verdict a prejudicial error or defect in that proceeding which would be something that, a prejudicial defect or error by the Court, not by counsel. So I don't think that lies here.

In his Article 851(B)(5) claim, Defendant argued ineffective assistance of counsel based on his trial counsel's failure to impeach A.W. The district court denied the claim, finding that the motion for new trial was an improper avenue, and ineffective assistance of counsel was better reserved for post-conviction proceedings. The district court, responding to defense counsel's argument stated, "[s]o because you call his performance an error, he may say that that was just trial strategy." The district court, reciting La. C.Cr.P. art. 851(B)(5), reasoned:

> And then five, the Court is of the opinion the ends of justice would be served by granting a new trial although the defendant may not be entitled as a matter of legal right. What I am saying to you is I am denying the Motion for a New Trial. . . . As we stand here today, your Motion for a New Trial based on Article 851 and the grounds for a new trial, I'm denying that and I note your objection.

Thus, our review of the record shows that the district court reviewed Defendant's motion for new trial, presided over the hearing on the motion, considered the merits and expressly denied the motion under both La. C.Cr.P. art. 851(B)(4) and (B)(5). Having found the district court did consider Defendant's motion for new trial, we will now turn to the merits of his motion.

Defendant posits in his second and third assignments of error that he is entitled to a new trial based on two grounds: (1) under a *Napue* claim, where he showed that A.W. falsified testimony; and (2) ineffective assistance of counsel.

*Napue violation*

21

The granting of a new trial based upon a *Napue* violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. 360 U.S. at 269, 79 S. Ct. at 1177. "Furthermore, fundamental fairness, i.e., due process, is offended 'when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *State v. Reel*, 10-1737, p. 16 (La. App. 4 Cir. 10/3/12), 126 So.3d 506, 517 (quoting *Napue*, 360 U.S. 264 at 269, 79 S. Ct. at 1177). Thus, "if a prosecutor allows a State witness to give false testimony without correction, a reviewing court must reverse the conviction gained as a result of that perjured testimony, even though the testimony goes only to the credibility of the witness." *Williams*, 17-0544, pp. 26-27, 240 So.3d at 370 (quoting *State v. Reed*, 14-1980, p. 41 (La. 9/7/16), 200 So.3d 291, 321, *reh'g granted in part*, 14-1980 (La. 10/19/16), 213 So.3d 384).

In his motion for new trial, Defendant argued that under *Napue* he is entitled to a new trial because of inconsistencies between A.W.'s trial testimony and the recorded statement to Det. McDonald, and that the State failed to correct her testimony. Specifically, Defendant points to inconsistencies concerning: (1) whether A.W. communicated with him prior to his visit to her workplace; (2) whether he showed up uninvited to her workplace; and (3) whether he followed her to the Bar without her consent. Defendant urged that A.W.'s false testimony wrongfully painted him as stalker, causing his testimony that A.W. consented and initiated the encounter to be discredited. Defendant further argued that this false testimony unfairly prejudiced him and was reasonably likely to have affected the outcome of the trial.

The district court rejected this argument and stated:

22

So wait, I'm kind of confused as to what you're saying there. You're saying she remembers it -- correct me if I'm wrong. You would agree if something happens to you, you could possibly remember it in the hours after it happened, but the trial a year before, you may not recall what happened then. You can recall it right it right after it happened, but that doesn't necessarily, [. . . ] you not recalling it a year after the fact doesn't mean that you're lying. It simply means I don't remember.

The district court further espoused:

What it boils down to is she never got up there and said I said no. She said she was drunk, she said she didn't remember, she said she passed out, there was some talk about cocaine, and then he got up there and said there was oral sex. She was bleeding and then he was turned off. At that point he admitted to a third degree rape.

The district court found that any inconsistencies in A.W.'s statements, which concerned events prior to the alleged crime, were immaterial and did not refute any evidence that tended to show that the defendant committed third degree rape. We agree.

In *State v. Everett*, 11-0714, pp. 45-47 (La. App. 4 Cir. 6/13/12), 96 So.3d 605, 635-636, this Court found that a witness did not perjure themselves when their trial testimony differed from a State memorandum. This Court explained that the discrepancies in the witness's testimony were not proof of perjury, but were proof that the witness remembered facts more clearly immediately after the incident versus two and half years later at trial. The *Everett* Court concluded that the discrepancies were immaterial and that it could not presume that the State had knowledge that the witness's trial testimony was false because of minor differences in a prior statement.

In the case *sub judice*, our review of the record, including the audio recordings, does not indicate the State suborned perjury testimony. As in *Everett,* we cannot presume that the State had knowledge that A.W.'s trial testimony was

23

false because of minor differences in a prior statement regarding events that occurred before the alleged rape. We find the district court did not abuse its discretion in denying Defendant's motion for new trial based on a *Napue* violation. This assignment of error lacks merit.

*Ineffective assistance of counsel*

"As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted." *Williams*, 17-0544, p. 23, 240 So.3d at 368 (quoting *State v. Quezada*, 13-1318, p. 10 (La. App. 4 Cir. 5/21/14), 141 So.3d 906, 914). "However, where the record is sufficient, the claims may be addressed on appeal." *Id*. An ineffective assistance of counsel claim is assessed by the two prong test established in *Strickland v. Washington*, 466 U.S. 668, 669, 104 S. Ct. 2052, 2055 (1984). "In order to prevail, the defendant must show both that: (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency." *Williams*, 17-0544, p. 23, 240 So.3d at 368 (quoting *Quezada*, 13-1318, p. 11, 141 So.3d at 915). "Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial." *Id*. "Decisions relating to investigation, preparation, and strategy cannot possibly be reviewed on appeal." *State v. Dantin*, 19-0407, p. 5 (La. App. 1 Cir. 12/17/19), 291 So.3d 1096, 1102 (citing *State v. Robinson*, 18-1005, p. 11 (La. App. 1 Cir. 4/10/19), 275 So.3d 938, 94). As such, "[a] trial strategy, even if it proves unsuccessful, does not give rise to an ineffective counsel claim." *State v. Lewis*, 00-1897, p. 11 (La. App. 4 Cir. 10/31/01), 800 So.2d 1077, 1083 (citing *State v. Brooks*, 505 So.2d 714, 724 (La. 1987)).

Defendant contends that his counsel was constitutionally ineffective for failing to impeach or effectively cross-examine A.W. with her recorded statement to Det. McDonald: (1) regarding familiarity with Defendant, (2) her willingness to go out with Defendant, (3) her level of intoxication, (4) her tolerance and use of drugs and alcohol and (5) Defendant's conduct. Our review of the record reflects that the district court, after hearing argument of counsel, indicated that a full evidentiary hearing where trial counsel could be given the opportunity to explain his motives or omissions was necessary for the ineffective assistance of counsel claim. We agree.

In *State v. Dominick*, 13-0121, p. 12 (La. App. 4 Cir. 11/20/13), 129 So.3d 782, 790, this Court held that there was insufficient evidence to resolve the defendant's ineffective assistance of counsel claim on appeal. The record in *Dominick* contained two affidavits executed by the defendant attesting to his trial counsel's alleged failure to investigate the case. This Court found that the affidavits did not address the defendant's contention that his prior counsel was ineffective for providing the defendant with misinformation regarding prison programs and sex offender registration. This Court concluded that the record lacked evidence from the defendant's previous counsel refuting his claims of ineffective assistance of counsel. The *Dominick* Court reserved the defendant's right to raise his claims on post-conviction relief where he would have the opportunity to present evidence in support of his claims to the district court. An application for post-conviction relief would allow the district court to hold a full evidentiary hearing on the matter, review the facts and determine the merits of the defendant's claims.

Similar to *Dominick*, in the case *sub judice*, the record is insufficient to evaluate and resolve Defendant's ineffective assistance of counsel claim on appeal. The veracity of Defendant's allegations of ineffective assistance of counsel cannot be sufficiently determined from an inspection of the record alone because the record is devoid of any evidence of trial counsel's intentions, i.e., whether the alleged deficiencies were strategy or the ineffective assistance of counsel.

We find that Defendant's allegations of ineffective assistance of counsel are more appropriate for an application for post-conviction relief. Thus, the district court did not err in deferring the matter. This assignment of error lacks merit.

**CONCLUSION**

For the foregoing reasons, we affirm Defendant's conviction and sentence.

**AFFIRMED**